801 So.2d 799 (2001)
Sullivan MILLER, Appellant
v.
STATE of Mississippi, Appellee.
No. 2000-KA-01052-COA.
Court of Appeals of Mississippi.
December 11, 2001.
*800 Jack R. Jones, III, Southaven, Kenya D. Brooks, Attorneys for Appellant.
Office of the Attorney General, by W. Glenn Watts, Jackson, Attorney for Appellee.
Before KING, P.J., BRIDGES, and IRVING, JJ.
IRVING, J., for the Court:
¶ 1. Sullivan Miller was convicted of aggravated assault by a DeSoto County jury and sentenced to twenty years with five years suspended. He appeals his conviction and sentence and argues (1) that the trial court erred in commenting, during voir dire, on his right to remain silent, (2) that the verdict of the jury is against the overwhelming weight of the evidence and is not legally supported by sufficient proof, (3) that the prosecutor improperly commented to the jury on "explained flight," and (4) that the trial court erred in denying an instruction pertaining to identification testimony. We are not persuaded by Miller's arguments and affirm his conviction and sentence.

FACTS
¶ 2. On December 3, 1998, Sullivan Miller and Louis Thompson were both employees of Computer Science Corporation (CSC), an IBM subcontractor. However, CSC's contract with IBM was due to expire at the end of December. CSC's contract would then be taken over by Tascorp. Thompson was the project manager for CSC, and Miller was a peripheral specialist. Tascorp had asked Thompson to make recommendations as to which employees should be retained by Tascorp. Thompson had recommended that Miller not be retained. On December 3, 1998, Miller was informed by human resources personnel from Tascorp that due to specific recommendations, his employment would terminate at the end of December 1998. However, Miller did not return to work after December 3, 1998.
*801 ¶ 3. On the night of December 3, Thompson heard a knock at his door. He went to the door and inquired as to the identity of the person knocking. An individual responded that he was having car trouble. When Thompson opened the door, two men were standing in front of his door, and a third man, who Thompson identified as Miller, was at the corner of the house in a crouched position with a gun in his hand. According to Thompson, Miller came around to the door and got close enough to place the gun near Thompson's chest. Miller grabbed Thompson by the arm and fired two shots, but Thompson moved quickly to the side. Fortunately, the two shots missed. However, Miller fired a third shot which struck Thompson in the arm.
¶ 4. Thompson recognized the two men at his door as associates of Miller. He testified that they had been to his house earlier in the year in the company of Miller. Thompson testified that although the lights were off in his home, he got a good look at Miller. He testified that the attack occurred in the area just inside his opened door and that he was face to face with Miller. According to Thompson, the night sported a full moon and clear skies. A street light across the street shined directly in his front door, providing good visibility.
¶ 5. Melvin Johnson, second shift supervisor for Tascorp, testified that on the night of December 3, 1998, Miller called once or twice, between the hours of 8:00 p.m. and 10:00 p.m., inquiring as to Thompson's whereabouts; Miller also wanted to know if Thompson had left him a Tascorp application. Tomeka Nelson, Thompson's girlfriend and former employee of CSC, testified that she knew Miller from when she worked at CSC and he had visited the home that she and Thompson shared. Nelson explained that she thought the source of the animosity between Miller and Thompson derived from something involving Miller's ex-girlfriend. She said that Miller told her in September 1998 that he was going to do something to Thompson and that if it was not for the fact that Nelson and her three children were residing in the house, he would have already done something to Thompson. She also testified that she received a phone call from Thompson between 11:30 p.m. and 12:00 a.m. on the night of December 3, 1998; he told her that Miller had shot him.
¶ 6. Officer Audrey Broadway testified that she received a page at 10:47 p.m. to respond to a shooting at Thompson's residence. When she arrived on the scene at 11:07 p.m., Thompson was en route to the hospital. Officer Broadway surveyed the scene for evidence and found three casings and two spent bullets fired from a nine millimeter gun. She testified that the electricity in the house was off; however, she said that there was sufficient light from the moon and streetlights to see as she walked around the outside of the house and stood at the doorway. Officer Broadway took Thompson's statement at the hospital. Thompson identified Miller as the shooter.
¶ 7. Dianne Mims, Miller's sister, testified that she was at her mother's home on December 3, 1998, from 5:00 p.m. until 2:30 a.m. The family was barbecuing, cooking, talking and just having a good time. She said that Miller was at their mother's house when she arrived and that he did not leave at any time. She explained that Miller could not afford to live on his own because he was having financial problems and that he left town the next day, December 4, to go to live with their brother in Chicago.
¶ 8. Ruby Ferguson, the mother of Miller's two children, testified that she was at *802 Miller's mother's house on December 3. She arrived in the evening and remained there all night. She stated that Miller came shortly after she arrived, and she did not see him leave.
¶ 9. Lee Hayes, a friend of Miller, testified that on December 3 he went to Miller's mother's house just before dark. He remained there until just before midnight. When he left, Miller was still there.

ANALYSIS AND DISCUSSION OF THE ISSUES

Comment During Voir Dire
¶ 10. Miller argues that the court erred in commenting to the jury during voir dire on his right not to testify. It is Miller's contention that the comment was improper because it drew attention to the fact that he did not testify. According to Miller, the comment infringed on his basic fundamental right to remain silent.
¶ 11. During the voir dire, in the context of explaining the burden of proof, the court stated, "The defendant does not have to say or do one thing because he is completely and totally innocent as he sits there. Does everybody understand that? Does anybody have any problem with that? If I asked you to vote right now if Mr. Miller was guilty, how would you vote?"
¶ 12. The State argues that this issue is waived because there was no contemporaneous objection and the matter was not raised in post-trial motions. The State directs the Court's attention to Haddox v. State, 636 So.2d 1229, 1240 (Miss.1994), holding that if an objection was not asserted at the trial, then the issue is not properly preserved on appeal. Moreover, as the State also points out, the record shows that the trial court gave a defense instruction which told the jury that "no presumption of guilt may be raised and no inference of any kind may be drawn from the accused's decision not to testify."
¶ 13. We agree that an objection at the trial court level is generally a prerequisite for preservation of the right of appellate review. Miller made no such objection. Notwithstanding Miller's failure to object, we find that the trial court's statement was not improper. Indeed, the trial court had an obligation to make sure jurors would not hold Miller's failure to testify against him in the event he chose not to testify. For these reasons, this issue is without merit.

Sufficiency and Weight of the Evidence
¶ 14. The standard of review of a claim that the evidence is insufficient to support the verdict requires the reviewing court to accept all evidence tending to support the verdict, including the inferences derived therefrom, as true. All evidence favoring the defendant must be disregarded. Bridges v. State, 716 So.2d 614(¶ 5) (Miss.1998). "We may reverse only where with respect to one or more of the elements of the offense charged, the evidence so considered is such that reasonable and fairminded jurors could only find the accused not guilty." Harveston v. State, 493 So.2d 365, 370 (Miss.1986). A claim that the trial court erred in not granting a new trial because the verdict is against the weight of the evidence is reviewed under an abuse of discretion standard. Malone v. State, 486 So.2d 360, 366 (Miss.1986). This Court will only reverse when the lower court has abused its discretion. Strong v. State, 600 So.2d 199, 204 (Miss.1992). "A new trial will not be ordered unless the verdict is so contrary to the overwhelming weight of the evidence that to allow it to stand would sanction `unconscionable injustice.'" Crawford v. State, 754 So.2d 1211, 1222(¶ 30) (Miss. 2000).
*803 ¶ 15. On the night of the shooting, Thompson identified Miller as the person who shot him. He told two people, Tomeka Nelson and Officer Broadway, that Miller shot him. Thompson also identified Miller in the courtroom. Additionally, Thompson testified that he was sure that Miller shot him. There can be no doubt that Thompson knew Miller because they had worked together for some time and were acquaintances. Thompson was shot at close range, giving him ample opportunity to view his assailant. Based on Thompson's testimony alone, we cannot say that reasonable and fairminded jurors could only find Miller not guilty of the shooting; nor can we say that allowing the verdict to stand would sanction an unconscionable injustice. Therefore, we find that the trial court did not err in overruling Miller's post-trial motions for a JNOV and new trial. This issue is without merit.

Closing Statement
¶ 16. During closing argument, the prosecution stated, "The next day he's gone on the bus to Chicagoon the bus to Chicago." Miller admits that no objection was made to the argument but argues that we should review this issue under the plain error doctrine. Miller further admits that, under the proper circumstances, evidence of recent flight is admissible, as consciousness of guilt. However, he contends that the prosecution's argument of recent flight was improper here because he fully explained, through the testimony of defense witnesses, the reason why he left for Chicago.
¶ 17. The State first points out that this issue is procedurally barred because of Miller's failure to object at the time the comment was made and his failure to raise it in his post-trial motions. The State points out further that the prosecution did not present evidence on flight, that the information was revealed during cross-examination of Ruby Ferguson, a witness for Miller. The State says that the prosecution merely commented on evidence that was already before the jury.
¶ 18. The admission of evidence is within the discretion of the trial judge, and his decision is reversible only when there has been an abuse of discretion which results in prejudice to the accused. Austin v. State, 784 So.2d 186 (¶ 23) (Miss. 2001). Evidence of unexplained recent flight is admissible as consciousness of guilt. Fuselier v. State, 702 So.2d 388 (¶ 4) (Miss.1997); Williams v. State, 667 So.2d 15, 23 (Miss.1996). However, a jury may be told that it may consider flight as a circumstance of guilt "only where that flight is unexplained and somehow probative of guilt or guilty knowledge." Fuselier, 702 So.2d at 390 (¶ 4). Miller contends that the defense witnesses explained that he went to Chicago to live with his brother for two reasons: he had given up his place of residence since he was having financial problems, and he needed to find work.
¶ 19. We cannot review this issue as plain error because we do not see error at all. We agree with the State that the evidence regarding Miller's leaving for Chicago was introduced by the defense. While the State says this evidence was introduced through defense witness Ruby Ferguson, our review of the records indicates that it was first introduced through defense witness Joanne Mims, one of Miller's sisters. She testified on direct examination as follows:
Q. Do you have an independent recollection of December 3rd, 1998?
A. Yes, I do.
Q. How so?
A. It was because of two reasons. The first reason is that my mom has been sick .... So we was, like, waiting *804 for her to pass, and my brother [Miller] said that, you know, he had-his phone and utilities and stuff had got cut off, and he was, like, I'm going to go stay with my older brother and work, you know, up in Chicago. So he was, like, "I'm leaving tomorrow."
¶ 20. On cross-examination, Mims gave this testimony:
Q. Ms. Mims, when did you first find out that Sullivan was a suspect in this shooting?
A. I don't know the exact date, but I know it was in January.
Q. Okay. So in January of 1999; correct?
A. Yes, sir.
Q. Okay. All right. And how did you find out?
A. I was at work, and I got a call from Sheronda and Louis.
Q. Louis. Okay. Was he arrested at that time or what?
A. No, he wasn't. He was in Chicago
Q. He was in Chicago?
A. at that time because the next day we put him on the bus going to Chicago.
Q. You put him on the bus?
A After, you know, the cookout and stuff.
¶ 21. Since the information regarding Miller's leaving for Chicago had been placed into evidence by him, the State was entitled during closing argument to discuss the evidence with the jury and make whatever points it deemed were supported by the evidence. Further, even if we were to consider this issue under the plain error doctrine and hold that the prosecution's argument was improper, we would also be compelled to conclude on the facts of this case that the error was, without doubt, harmless.

Denial of Jury Instruction Regarding Identification Testimony
¶ 22. In his final assertion of error, Miller contends that the trial court erred in refusing to give jury instruction D-2 which states:
The court instructs the Jury that if the prosecution has offered identification testimony, that is, the testimony of an alleged eyewitnesses who saw the Accused commit the act charged or anything related thereto, then you may consider the eyewitness's opportunity to observe the perpetrator during the commission of the act charged or any part thereof. The testimony of the eyewitness that he is positive of his identification may be considered to have whatever value that you, the Jury, desire to give it, but that alone does not relieve you of your duty to consider his or her identification testimony and to reject it if you find it unreliable. The alleged identification must meet with your satisfaction beyond a reasonable doubt that the perpetrator was, in fact, the Accused; and if the prosecution has not proved the identification to your satisfaction, beyond a reasonable doubt, then you shall find the Accused NOT GUILTY.
¶ 23. The trial judge ruled that he would not allow the instruction because it brought "inappropriate attention to one particular witness as opposed to any other, and the general instructions do cover consideration they're suppose to be giving each and every witness individually." However, the trial judge gave instruction 12 which states:
The court instructs the Jury that in reviewing the alleged identification of the Accused, you may consider the witness's *805 capacity for memory and for observation, his or her familiarity with the Accused, any bias or prejudice that he or she may have toward the Accused, any bias or prejudice that he or she may have toward the Accused, and any other matters in evidence in this case which you may deem worthy of consideration.
There is some indication in the record that instruction 12 was actually offered by Miller as instruction D-3.
¶ 24. We also note from the record that the trial court also gave the following instruction offered by Miller:
The Court instructs the Jury that the Accused has asserted the defense of Alibi by stating that he was in the State of Tennessee at the time of the commission of the offense which allegedly occurred in Olive Branch, Mississippi. The defense of alibi is a legal and proper defense under our state law. The Accused is not required to establish the truth of his alibi to your satisfaction; [sic] but if the evidence of lack of evidence in this case raises in the minds of the jury a reasonable doubt as to whether the Accused was present and committed the crime, then you must find him not guilty.
It is obvious that the jury could not believe Miller's alibi and, at the same time, believe Thompson's eyewitness identification of him.
¶ 25. In support of his argument that the trial judge should have given instruction D-2, Miller argues that he was convicted on the testimony of a single witness, while other witnesses testified that he was in Memphis. He directs us to Warren v. State, 709 So.2d 415 (Miss.1998), where our supreme court overturned the appellant's conviction because of the failure of the trial court to give an instruction speaking to identification evidence as well as a lesser-included offense instruction. Id. at 420-21 (¶ ¶ 26, 28). In Warren, the State's proof rested on the identification of one witness. Id.
¶ 26. The State points the Court's attention to Sanders v. State, 586 So.2d 792, 796 (Miss.1991), which holds that jury instructions should not be given which unduly emphasize one portion of testimony over another. Further, the State says instruction 12 addresses the identification testimony.
¶ 27. We agree with the State's assertion, as well as the trial judge's reasoning, but we also find that instruction 2 was properly rejected because it is both an incomplete and incorrect statement of the law on identification testimony. It is an incorrect statement inasmuch as it requires the jury to return a verdict solely on its consideration of the eyewitness identification evidence rather than on the evidence as a whole, including the eyewitness identification testimony. It is an incomplete statement of the law because it does not include all of the factors that are to be considered by the jury in evaluating identification testimony.
¶ 28. A proper instruction on the law of identification testimony may be found in Davis v. State, 568 So.2d 277, 280 (Miss. 1990), where the Mississippi Supreme approved the following instruction:
The Court instructs the Jury that in reaching your verdict you are to consider all of the evidence concerning the entire case and the circumstances surrounding the crime. One of the issues in this case is the identification of George Lee Davis as the perpetrator of the crime. As with each element of the crime charged, the State has the burden of proving identity beyond a reasonable doubt, and before you may convict George Lee Davis you must be satisfied beyond a reasonable doubt of the accuracy *806 of the identification of George Lee Davis. If, after considering all of the evidence concerning the crime and witness' identification of George Lee Davis as the person who committed the crime, you are not convinced beyond a reasonable doubt that he is the person who committed the crime, then you must find him not guilty. Identification testimony is an expression of belief or impression by the witness. You must judge its value and reliability from the totality of the circumstances surrounding the crime and the subsequent identification. In appraising the identification testimony of a witness, you should consider the following:
1) Did the witness have an adequate opportunity to observe the offender?
2) Did the witness observe the offender with an adequate degree of attention?
3) Did the witness provide an accurate description of the offender after the crime?
4) How certain is the witness of the identification?
5) How much time passed between the crime and the identification?
If, after examining all of the testimony and the evidence, you have a reasonable doubt that George Lee Davis was the person who committed the crime, then you must find George Lee Davis not guilty.
¶ 29. We find that while instruction number 12, which was given by the trial judge, fell somewhat short in its thoroughness, the instruction nevertheless provided the jury some guidance on the law of identification testimony. We further find the lack of thoroughness in the instruction is at worse harmless error. This is particularly so since there was other compelling evidence that Miller was attempting to determine Thompson's whereabouts on the night of the attack and had threatened in September 1998 to do something to Thompson. Accordingly, we find this issue to be without merit. We further find that the trial court did not commit any reversible error; therefore, we affirm Miller's conviction and sentence.
¶ 30. THE JUDGMENT OF THE CIRCUIT COURT OF DESOTO COUNTY OF CONVICTION OF AGGRAVATED ASSAULT WITH A DEADLY WEAPON AND SENTENCE OF TWENTY YEARS IN THE CUSTODY OF THE MISSISSIPPI DEPARTMENT OF CORRECTIONS WITH THE LAST FIVE YEARS SUSPENDED PENDING APPELLANT'S FUTURE GOOD BEHAVIOR IS AFFIRMED. ALL COSTS OF THIS APPEAL ARE ASSESSED TO THE APPELLANT.
McMILLIN, C.J., KING and SOUTHWICK, P.JJ., BRIDGES, THOMAS, LEE, MYERS, CHANDLER AND BRANTLEY, JJ., CONCUR.